Argued April 11, reversed July 24, 1923.

## HERMANN *v*. CLARK.

(219 Pac. 608.)

**Principal and Agent—Complaint Held Insufficient to Authorize Recovery of Commission as Damages from Unauthorized Agent.**

1. In a broker's action for damages from one employing him to find a purchaser for a lot without authority from the owners, a complaint not averring that defendant had no authority to act or that the owners repudiated his action *held* insufficient, notwithstanding an averment that defendant "now claims" to have had no authority and narration of evidence tending to support the missing allegations.

**Principal and Agent—Professed Agent not Liable on Contract Unless Unauthorized to Act.**

2. One professing to act as agent of another in executing a contract is liable for a breach thereof, if he acted without authority, and the other contracting party performs his agreement, but if authorized to act, to the latter's knowledge, he is not liable.

**Principal and Agent—Unauthorized Agent not Liable on Contract, Unless It so Provides.**

3. An agent is not liable on a contract executed by him without authority, unless it contains appropriate words binding him personally.

**Principal and Agent—Party Contracting With Unauthorized Agent may Sue Him on Theory of Implied Warranty of Authority.**

4. One contracting with a professed agent, acting without authority, may sue him for damages on the theory that he im-

2. Liability of agent executing contract in name of principal without authority, see notes in 3 Ann. Cas. 219; Ann. Cas. 1915D, 722.

pliedly warranted or promised that he had authority to bind the supposed principal.

**Principal and Agent—Nature of Action Against Unauthorized Agent and Measure of Damages Stated.**

5. An action against one acting as agent without authority in contracting with plaintiff is for damages, whether in the nature of an action for deceit or breach of implied warranty; the measure of damages being the loss sustained as the natural and probable consequences of defendant's want of authority.

**Principal and Agent—To Recover Damages from Unauthorized Agent for Loss of Contract, It must be of Value Against Principal, if Authorized.**

6. One contracting with an unauthorized agent cannot recover damages for loss of the contract, unless it would have been of some legal value against the principal, if authorized by him.

**Principal and Agent—Broker Suing Unauthorized Agent Employing Him, for Damages in Amount of Agreed Commission, must Show Ability to Perform His Part of Agreement.**

7. For a broker employed by an unauthorized agent to find a purchaser for another's property to recover damages from the agent in the amount of the agreed commission, he must show his ability to perform his part of the agreement.

**Principal and Agent—Broker Finding Purchaser for Less Than Agreed "Net" Price After Deducting Unpaid Assessments Held Entitled to Agreed Commission as Damages from Unauthorized Agent of Owners Without Tendering Purchase Bonds to Them or Showing Them in Default.**

8. A broker, finding a purchaser ready and able to pay $6,200 in Liberty Bonds, less unpaid assessments and the broker's fee, *held* entitled to recover the amount of the agreed commission as damages from his principal, whose want of authority to act for the owners he did not discover until after he found the purchaser, though the net price was less than $5,700 in bonds, as stipulated in the employment contract without showing that he tendered the bonds to and demanded a deed from the owners, or that they were in default, especially where the supposed agent refused to sell unless the purchaser assumed the assessments; the word "net" meaning $5,700 over and above the agreed commission, but not the assessments.

**Principal and Agent—Burden on One Suing Unauthorized Agent for Damages to Show Implied Warranty of Authority, Breach and Resulting Damages.**

9. In an action by one contracting with an unauthorized agent to recover damages from the latter, the burden is on plaintiff to show defendant's implied warranty of authority to bind the supposed principal, its breach, and the resulting damages.

---

8. When broker has earned commission, see note in 139 **Am. St. Rep. 225.**

From Multnomah: W. N. GATENS, Judge.

Department 1.

REVERSED.

For appellant there was a brief and oral argument by *Mr. Bartlett Cole.*

For respondent there was a brief over the name of *Messrs. Ridgway & Johnson,* with an oral argument by *Mr. Albert B. Ridgway.*

BURNETT, J.—The plaintiff, who is a real estate broker, alleges in substance that on April 8, 1920, the defendant, claiming to represent the owners of a city lot in Portland,

"by his writing by him signed and to plaintiff delivered, retained and hired plaintiff in his said capacity of real estate broker and gave to plaintiff exclusive authority for a period of 30 days thereafter to find a purchaser for said property at the agreed price therefor of $6,200, said defendant agreeing in writing, on behalf of and as agent of said owners of said property, to accept payment of said sum for said property in United States Liberty Bonds at par, plus accrued interest to date of transfer of said property, and in event of a purchaser being found by plaintiff for said premises upon said terms to pay and turn over to plaintiff as plaintiff's commission and compensation for his said services the amount of $500, par value of said Liberty Bonds."

He further avers in substance that on April 9, 1920, without knowledge by him that defendant had no authority so to employ him, he found a purchaser ready, willing and able to purchase the property at the price and terms of payment therefor so by de-

fendant agreed to be accepted and that upon report of same to the defendant, he authorized the plaintiff to make sale to the proposed purchaser for the amount and on the terms stated and he thereupon made a sale to the purchaser and delivered possession of the property to him, taking from him a partial payment of $200 in the name of and as agent for said owners of said property and, as such agent, entered into a written contract with the purchaser for the transfer of the property and for the payment of the balance of the purchase price. The plaintiff claims that on April 11, 1920, the defendant fully approved what the plaintiff had done and again agreed to pay over to plaintiff as his commission the par value amount of $500 of said bonds as averred. The complaint concludes with an allegation as follows:

"That plaintiff has made demand upon defendant for payment of plaintiff's said commission so due him as aforesaid, but that defendant now claims to at no time have had and to not now have authority to act as aforesaid for the owners of said property in authorizing or making or causing to be made said sale thereof or for the employment for said purpose of plaintiff herein and has refused and still refuses to make payment to plaintiff of his said commission so earned and become due as aforesaid and that by reason of the facts aforesaid plaintiff has been by defendant damaged in the sum and amount of $500."

Without averring any new matter, the answer of the defendant denied each and every allegation of the complaint. The evidence upon which the plaintiff essays to charge the defendant consists exclusively of written correspondence between them. At the close of plaintiff's case before the jury, the de-

fendant moved the court for an involuntary nonsuit against the plaintiff, among others, for the reasons that it is alleged in the complaint that the commission is payable out of special funds, that is, out of Liberty Bonds if they had been turned over by the purchaser and the Liberty Bonds have never been paid by the purchaser; and that the complaint does not state facts sufficient to constitute a cause of action. This motion was denied, as well as defendant's motion for a directed verdict in his favor at the conclusion of all the evidence.

The court instructed the jury as follows:

"Now, it is claimed by Mr. Clark that he had no authority to offer the property for sale and that he was under no legal obligation to comply with the terms of the alleged contract. I instruct you as a matter of law that if without any knowledge upon the part of plaintiff he held himself out to represent the owners of the property and so holding himself out, he made a contract with Mr. Hermann, such as I have indicated, then it would make no difference whether he had authority or not, if the plaintiff, in good faith, performed his part of the contract between them, and was able to and did find a purchaser ready, able and willing to purchase upon the terms agreed upon between he and Mr. Clark, defendant is liable.

"You are instructed that if you find from the evidence that defendant John T. Clark made a contract with the plaintiff Schiller B. Hermann to pay a commission to said Schiller B. Hermann and that said Schiller B. Hermann knew at the time that said John T. Clark was acting or expecting to act in his capacity as administrator, then there can be no recovery in this case and verdict should be for the defendant, but if Clark represented to Hermann that he had authority to act for the owners, whether he had authority or not, he would be liable."

There was a verdict in favor of the plaintiff in the sum of $407, and the defendant appealed from the ensuing judgment.

The real property involved consists of a city lot and residence thereon which formerly had been occupied as such by the plaintiff. It appears to have been owned by James Taggart, the heirs of Hannah C. Taggart, deceased, and the heirs of Helen T. Clark deceased, mother of the defendant. There was considerable other realty under the same ownership in Portland which is not involved here for which, in common with the one in question, Fred Silcocks was a general agent for collecting rent and the like. As early as September 26, 1914, Silcocks, in response to an inquiry from the present plaintiff, wrote the latter:

" * * as to the lowest figure on the property that you now occupy, would say—

> The house we value at......$4000–00
> The lot we value at......... 1800–00
> The street assess-t is........  514–44 * * "

About March 23, 1920, Clark who at the time was a member of the faculty of the University of California residing at Berkeley in that state, wrote a letter to the plaintiff suggesting that the latter buy the property. The plaintiff, in response to this, sent to the defendant under date of March 29, 1920, the following telegram:

"Your proposition reached me too late. Had I been in communication with you instead of Silcocks, would have purchased your property. If you will give me exclusive sale for thirty days at price and terms yours March twenty third, I will put place in condition and sell to net you fifty five hundred as desired. Wish to deal direct with you. Wire or write me care Lumbermens Bldg."

On the same date the defendant telegraphed the plaintiff as follows:

"Gratified to receive your wire. Your proposition entirely satisfactory. Will gladly guarantee you exclusive right of sale for thirty days at price to net me fifty five hundred, two thousand down. Would regard balance fifty monthly including interest at seven percent as fair. Will write."

In a letter of the following day to the plaintiff, the defendant confirmed the telegram last above quoted and said:

"I am expecting to take up my residence in Portland about May 1st for the purpose of taking out letters of administration and closing out the whole estate as expeditiously as a fair valuation of the various properties may permit. * * There is about $10,000 against the lots for street work, but I shall arrange soon after my arrival to get six or eight of them entirely free and clear so that building operation can be begun without delay."

A letter from plaintiff to defendant under date of April 7th contains this matter:

"I wish to say to you that I have made a price of $6,000, the terms being $2,500 cash and the balance at $50 per month including interest at 7%. This will give you $5,500 with $2,000 cash payment and the balance in accordance with your desire as stated in your letter to me. * * I shall advise you so soon as I have definite information."

Here follows a telegram dated April 7, 1920, from plaintiff to defendant:

"Can secure net to you fifty five hundred dollars in Liberty Bonds at par in full payment for house and lot * * . Reply."

On April 8th the defendant telegraphed to the plaintiff as follows:

"Regret owing to unsettled economic situation cannot accept less than fifty seven hundred in Liberty Bonds at par, interest coupons cashed to date. Am willing to accept fifty four hundred cash or original terms fifty five hundred net, two thousand cash, fifty monthly including interest seven per cent."

On the 9th of that month the plaintiff telegraphed to the defendant as follows:

"Have sold property for sixty two hundred in Liberty Bonds at par netting you fifty seven hundred in bonds as per your wire eighth. Please accept this by wire to be shown purchasers and specify sale price only of sixty two hundred bonds, this price to be incorporated in deed. Also advise how soon we may expect abstract and deed as parties wish to begin alterations. My purchaser understands that sixty two hundred bonds goes to you out of which commission is payable. Therefore since we understand ourselves, handle the whole matter on basis of sixty two hundred."

To this the defendant telegraphed to the plaintiff as follows:

"Will accept sixty two hundred in Liberty Bonds at par for house and lot six hundred east twenty fifth street. Expect to arrive in Portland about May seventh or eighth. Will arrange for delivery of abstract and deed as soon as possible thereafter."

This telegram, the defendant supplemented by his letter to the plaintiff under date of April 11, 1920, as follows:

"I trust that you have received my night letter of last evening expressing my willingness to accept $6,200 in Liberty Bonds at par, with the understanding of course, between ourselves, that the net price coming to me will be $5,700 on the same basis of payment. * * "

On April 12th, the plaintiff addressed a letter to the defendant as follows:

"*Personally* and *confidentially* I once again wish to mention the terms of sale and the amount to be paid, $6,200, in Liberty Bonds at par. Your wire of confirmation which was shown to Mr. Johnson this morning, naming the amount $6,200 is just as I desired, for which I thank you. In order that you may not misunderstand, I will again say that Mr. Johnson is under the impression that you are receiving $6,200 in Liberty Bonds, out of which a commission is payable. I desire this impression to remain with him as it might offend him if he thought the deal was otherwise."

Meanwhile, on April 9, 1920, without further authority than what may be derived from the correspondence thus far quoted in this opinion, the plaintiff and Everett A. Johnson, the proposed purchaser, executed the following paper:

"MEMORANDUM OF AGREEMENT, Made in duplicate and entered into this 9th day of April, 1920, between the heirs at law of David Taggart, deceased hereinafter termed the Vendor, and Everett A. Johnson, hereinafter termed the Vendee, WITNESSETH:

"That the Vendor has sold and hereby sells to the Vendee, and the Vendee has purchased and hereby purchases from the Vendor, that certain property at #600 E. 25th St. N. at the corner of Stanton St. and described as Lot 1, of Block 4 of Stanton St. addition in the City of Portland, Multnomah County, Oregon, at and for the agreed purchase price of Six Thousand Two Hundred ($6200.00) Dollars, payable in United States Liberty Bonds of any issue, at par, plus accrued interest, on account of which purchase price, receipt by the Vendor is hereby acknowledged of Two Hundred ($200.00) Dollars par value of United States Liberty Bonds of the second issue with interest accrued thereon from date of November 15, 1919.

108 Or.—30

"The balance of the purchase price of said property shall be paid by the Vendee to the Vendor in said Bonds at par plus the accrued interest upon delivery by the Vendor to the Vendee of Abstract of Title, showing good and merchantable title to said property in the Vendor, free of encumbrance and upon tender to the Vendee of deed of general warranty, conveying said title and property to the Vendee, free from encumbrance, Abstract to be furnished Vendee within Twenty (20) days from date hereof, and deed to be tendered Vendee within Thirty days from date hereof.

"HEIRS AT LAW OF DAVID TAGGART,
"Deceased Owner.
"Signatures witnessed:
"By SCHILLER B. HERMANN, Agent.
"EVERETT A. JOHNSON, Vendee."

The plaintiff forwarded this document to the defendant about the date of its execution. On April 18th, the defendant returned to the plaintiff the agreement mentioned, saying in his letter,

"I am returning unsigned the agreement of sale for the reason that I am unable to bind myself to a specific date for the delivery of the deed." ·

On May 22, 1920, the plaintiff wrote to the defendant a letter from which the following is an excerpt:

"Just a word Mr. Clark regarding the assessments. I was always under the impression there were assessments against the property and I was surprised when I called at the City Auditor's Office with a pen sketch or plat of the Stanton St. Addition and was advised all were paid.

"In one of your letters to me you stated there were assessments aggregating Ten thousand dollars against the Taggart Estate property and it was then I called to look it up. I told Mr. Johnson I was under the impression there were assessments against the property but was advised at Auditor's Office, all were paid."

He goes on to say in substance, in that letter, that upon further inquiry he found there an existing assessment against the property which was confirmed by examination at the city auditor's office. He narrates an offer to compromise with the purchaser, on the basis of remitting part of the plaintiff's alleged commission, and further says:

"I am doing this because I feel it is right for me to do so and therefore in considering this deal do not count your obligation to me at a larger amount than $250. in Bonds. I hope this may relieve the situation. In any event, I offer half of my commission either to Mr. Johnson or yourself to be applied on the assessments."

1. The effort of the plaintiff seems to be to frame a complaint based upon the authority of *Cochran* v. *Baker,* 34 Or. 555 (52 Pac. 520; 56 Pac. 641), a precedent cited in his own brief. In that case Baker, assuming to act as agent for Goodale, signed the latter's name to a building bond which was delivered to the plaintiff to secure him and his associates against liens upon a building which was then being erected for them. It afterwards transpired as related in the complaint that Baker had no authority whatever and that on presentation of it to Goodale, the latter repudiated and denied the execution of the bond. The court held the defendant, Baker, liable upon his implied warranty that he had authority to execute the bond as the act of Goodale, all to the same extent as Goodale would have been if the bond had been executed by him. In this case, the complaint avers that the defendant agreed in writing on behalf of and as agent of said owners of said property, clearly indicating that the contract was made as by an agent in the name of a principal, avowedly without pretending to be per-

sonally liable on the contract. It is not averred in the complaint at all, that the plaintiff did not in fact have authority. Neither is it stated, as in the Cochran-Baker case, that the supposed principals repudiated the action of the defendant in professing to act as their agent, nor is there any averment that a demand was made upon them for performance on their part, of the contract so alleged to have been made for them. For all that appears in the complaint, the hiring of the plaintiff was the act of the owners either by original authority to the defendant, or by subsequent ratification. True enough, it is averred in the concluding paragraph of the complaint in substance, that the defendant now disclaims having had any authority to act for the owners of the property. In other words, the plaintiff pleads a subsequent declaration of the defendant. The absence of his agency or of his authority to act as agent is one thing essential to be stated in the pleading. A narration of the evidence which might support such an allegation does not measure up to the rule of pleading. If it had been averred directly that the defendant had no authority and the averment had been traversed, his oral admission, as practically quoted in the complaint, would have been admissible in evidence against him. If in fact, he had authority at the time the alleged contract was made, his subsequent declaration about it one way or the other would not affect the case. In other words, it is one thing to plead a fact and quite another and insufficient thing to narrate testimony in a pleading.

The averment of the complaint is that the plaintiff was to find a purchaser who would pay $6,200 in Liberty Bonds and that defendant was "to pay and turn over to plaintiff * * the amount of $500 par value

of said Liberty Bonds.'' No other bonds except ''said Liberty Bonds'' were contemplated or mentioned and these were the ones to be paid by the purchaser to the sellers. It is manifest that the latter, or Clark whom the plaintiff substitutes for the owners, could not ''pay and turn over to plaintiff'' any of ''said'' bonds until they came into his possession by payment of them to him. The complaint therefore is predicated upon the formation of a fund of Liberty Bonds from which the plaintiff's compensation should be paid in kind. This in turn, involves the performance of, or at least an offer to perform, a contract between the proposed purchaser and the owners of the property, containing concurrent covenants whereby, on the tender of the required amount of bonds, the owners should convey the property to the purchaser, resulting in the establishment of that fund. The owners, for whom the complaint alleges the defendant professed he could act, were not in default and the erection of the fund thereby prevented, until the purchaser should himself tender performance on his part by at least offering to deliver the bonds to the defendant. The complaint is utterly silent on this point.

That it was the intention of the parties to this litigation that the compensation of the plaintiff, if payable at all, was to be paid out of the purchase price of the property, is shown by the telegram of the plaintiff to the defendant under date of April 9th, in which he says:

''Have sold property for sixty two hundred in Liberty Bonds at par netting you fifty seven hundred in bonds as per your wire eighth. Please accept this by wire to be shown purchasers and specify sale price only of sixty two hundred bonds, this price to be incorporated in deed. * * My purchaser under-

stands that sixty two hundred bonds goes to you out of which commission is payable. * * "

This construction is further enforced by the letter from the defendant to the plaintiff on April 11, 1920, saying in part,

"I trust that you have received my night letter of last evening expressing my willingness to accept $6,200 in Liberty Bonds at par, with the understanding of course, between ourselves, that the net price coming to me will be $5,700 on the same basis of payment. * * "

This is strongly indicated also by the letter of the plaintiff to the defendant on April 12th, saying,

"Your wire of confirmation which was shown to Mr. Johnson this morning naming the amount of $6,200 is just as I desired, for which I thank you. In order that you may not misunderstand, I will again say that Mr. Johnson is under the impression that you are receiving $6,200 in Liberty Bonds, out of which a commission is payable. * * "

That a commission cannot be collected until the fund out of which it is to be paid becomes available is taught by *Oregon Home Builders* v. *Montgomery Investment Co.,* 94 Or. 349 (184 Pac. 487); *Becker* v. *Oregon-Kansas Timber Co.,* 99 Or. 602 (195 Pac. 1038).

The theory of the complaint is that the defendant, assuming to act as agent for the owners of the property, made a contract with the plaintiff for the latter to find a purchaser who was ready, able and willing to buy the property on certain terms, resulting in the formation of a fund out of which his commission was payable. If we grant for the moment that the defendant had no authority to represent the owners, yet all that can happen, according to the doctrine of

*Cochran* v. *Baker,* is that the law will merely put him in the place of his principals, requiring him to answer as they would be required and not only so, but will also give him the defenses that could be urged by those principals. In that very case, Baker's liability was diminished by reason of the fact that the plaintiffs had made payments contrary to the conditions of the bond. In other words, according to the attempted theory of the present complaint, the defendant was put into the shoes of the owners and is entitled to the same standing they would have under similar circumstances, if the contract were their own. If they would have been liable to pay the commission, provided the alleged contract was authorized, so would he be likewise bound, otherwise not. But, as we have seen, the contract averred by the complaint contemplates a fund which could only arise by the payment of the purchase price in the form of bonds out of which purchase price alone, the plaintiff would receive his compensation. The principals could not have been in default until the bonds had been tendered. Not until then and their refusal to accept them, would they have offered any obstacle to the collection of that fund. In like manner, the defendant has not yet been shown to have interposed any resistance to the erection of the fund as the source of plaintiff's compensation.

Further: the correspondence which passed between the parties is the only evidence in the record of the contract between them, one of the terms of which was that the defendant was to receive a net price of $5,700 in bonds. The letters quoted show that the plaintiff knew there was a lien of $514.44 against the property for street improvements. It seems that the proposed purchaser did not receive any information concern-

ing this lien until after he had signed the memorandum already quoted and had advanced to the plaintiff $200 in bonds. That instrument, however, cannot affect the relation between the plaintiff and the defendant because the plaintiff was only authorized to find a purchaser and not to sell the property. Besides this the defendant, as he had a right to do, rejected that instrument and refused to sign it.

It was the duty of the plaintiff, before he could earn his fee, to produce a purchaser who would pay enough to net to the defendant $5,700. If the defendant were required to pay out of the $5,700 the $514.44 street assessment, his net price would be lessened by that amount. As between the plaintiff and the defendant, one of the terms of sale was such a price as would net the latter $5,700. This condition could not be fulfilled if out of $6,200 offered, $514.44 street assessment plus even $250 as plaintiff's fee, were to be deducted, as that would net the defendant only $5,435.56. In brief, the defendant understood the price to be net $5,700 and the purchaser understood gross $6,200. The amount offered by the purchaser was not identical with that contemplated by the defendant, hence their minds did not meet. It seems, from testimony appearing in the record, that when the defendant and the proposed purchaser came into direct communication with each other, the street assessment was the very rock upon which their negotiations were wrecked resulting in unsuccessful efforts to compromise. It is manifest that the man proffered by the plaintiff as a purchaser was not one willing or ready to pay a price which would net the defendant $5,700 in Liberty Bonds. The production of such a purchaser is a *sine qua non* upon which the plaintiff's recovery of compensation depends.

It is true, as stated in *Collins* v. *Delashmutt,* 6 Or. 51, that ''it is now a settled principle of law governing all executory contracts for the sale of real property that there is an implied warranty on the part of the vendor that he will convey a good title.'' Here, however, the terms of the contract calling for a net price, qualifies the implied warranty mentioned to the extent that at least so far as the encumbrances known to the plaintiff here are concerned, they are not to be reckoned as affecting the title to be conveyed.

2. The instructions quoted, perhaps given inadvertently, lay down the doctrine that if the plaintiff performed his part of the contract alleged to have been made for and in the name of certain principals, the defendant who acted as agent was liable whether he had authority or not. We may well say, in accordance with *Cochran* v. *Baker,* that if one professing to act as agent had in fact no authority to do so, he is liable the same as the principal would have been if the other contracting party performed his part of the agreement. But on the other hand, if indeed with plaintiff's knowledge, the defendant did have authority to act as agent for the owners of the property in the manner stated in the complaint, the defendant would not be liable on the contract. The instructions quoted make him liable, irrespective of whether he had authority or not, and were erroneous accordingly.

In brief, the complaint does not allege that the defendant acted without authority; nor that the supposed principals refused to be bound by the contract as made; nor that it was due to any fault of the defendant that the fund did not accrue out of which the plaintiff's fee was to be paid; and lastly, it does not appear that the plaintiff procured a purchaser

who was ready, able or willing to pay enough to net
to the owners $5,700 in government bonds.

The judgment of the Circuit Court is reversed.

REVERSED.

HARRIS, J., Specially Concurring.—I concur in
the conclusion that the instructions quoted in the
opinion of Mr. Justice BURNETT constituted reversi-
ble error and that the judgment must for that reason
be reversed. Although there may be room for debate
as to whether or not, in the absence of a demurrer
interposed before the filing of an answer, the com-
plaint sufficiently alleges that Clark lacked authority
to represent the supposed principals, I readily con-
cur in the conclusion that a perfect pleading requires
a direct averment of lack of authority. However, I
am unable to agree with the theory that the complaint
must allege that a demand was made upon the sup-
posed principals, or with the view that Clark in all
respects stands in the shoes of the supposed princi-
pals, or with the notion that Hermann's right of
action involved as an essential prerequisite a tender
of the bonds to the supposed principals, or with the
contention that the word "net," as used by Hermann
and Clark, means as a matter of law $5,700 over
and above Hermann's commission and the assess-
ments against the property.

3, 4. It must be constantly borne in mind that this
is not an action to recover a commission. In this
jurisdiction and by the weight of authority an agent
is not liable upon a contract which he enters into
without authority, unless it contains appropriate
words to bind him personally; for the reason that it
is neither the contract of the principal nor the con-
tract of him who assumes to act as agent. The rem-

edy accorded to the third person is in some jurisdictions deemed to be in the nature of an action for deceit; while in other jurisdictions, including Oregon, an action may be maintained by the third person against the assumed agent on the theory that the assumed agent impliedly warranted or promised that he had authority to bind the supposed principal; and as said in *Anderson* v. *Adams,* 43 Or. 621, 626 (74 Pac. 215, 217):

"This promise is not a part of the agreement supposed to have been entered into with the principal, but independent thereof, and tantamount to an implied warranty that, if a third party will enter into a contract with the agent on behalf of his principal, he will indemnify such party against any loss that he may sustain, if it shall be ascertained that he does not possess the measure of authority which he assumes." 2 C. J. 806; *Cochran* v. *Baker,* 34 Or. 555, 563 (52 Pac. 520, 56 Pac. 641); *Sorenson* v. *Kribs,* 82 Or. 130, 135 (161 Pac. 405); *Hinton* v. *Roethler,* 90 Or. 440, 450 (177 Pac. 59).

5. But whether the action is regarded as one in the nature of an action for deceit or as one for the breach of implied warranty, it is for damages and the measure of damages is the loss which has been sustained as the natural and probable consequences of the want of authority: 2 C. J. 811; 1 Mechem on Agency (2 ed.), § 1399.

In *White* v. *Madison,* 26 N. Y. 117, 124, the view was expressed that not only in a specified class of cases but also in all cases

"where one, pretending to be an agent, has contracted as such without authority from the principal, the party contracted with, on learning the facts, must have the right to repudiate the contract, and to hold the assumed agent immediately responsible for dam-

ages, without waiting for the time when an action might be maintained on the contract itself; and the damages must be measured, not by the contract, but by the injury resulting from the agent's want of power.''

In other words, the doctrine of the excerpt last quoted is that a right of action accrues to the third person the moment he learns of the want of authority of the assumed agent. However, we are not required to ascertain whether Hermann might have recovered damages if he had sued Clark before finding a purchaser.

6, 7. It must be conceded that the third person cannot have from the unauthorized agent damages for the loss of the contract, unless the contract is ''one which would have been of some legal value against the principal, if it had been authorized by him'' (1 Mechem on Agency (2 ed.), § 1401; 2 C. J. 810); and it must also be conceded that before Hermann can recover damages measured by the amount of the agreed commission he must show that he had the ability to perform his part of the agreement: *Kent v. Addicks*, 126 Fed. 112 (60 C. C. A. 660); 2 C. J. 811.

8. Hermann did show that he had the ability to perform. He found a purchaser who was ready, able and willing, and indeed anxious to pay $6,200 in Liberty Bonds for the property. Clark left California and arrived in Portland, Oregon, where the property is located and where Hermann and Johnson reside, about the middle of May. Everett A. Johnson was the purchaser found by Hermann. In April, before Clark left California, Johnson was anxious to buy and after Clark's arrival in Portland Johnson was still very anxious to buy for $6,200 in Liberty

Bonds; but, according to Clark's own testimony, he was unwilling to sell unless Johnson assumed the unpaid assessments with which the property was burdened. This position taken by Clark brings us to a consideration of the meaning of the word "net."

The writer is of the opinion that it cannot be said as a matter of law that the word "net," as used in the letters and telegrams signed by the parties, meant $5,700 over and above the assessments. The letter of April 11, 1920, written by Clark wherein he states that the understanding is "that the net price coming to me will be $5,700," means, when construed in the light of the other correspondence, that Clark was to receive $5,700 over and above the commission to be paid to Hermann; and it seems to the writer that when to the light of the other correspondence is added the light afforded by the testimony of the witnesses it is impossible within the recognized rules of construction to say as a matter of law that the word "net" means $5,700 over and above the commission and the assessments. If the word "net" meant over and above the assessments it also meant over and above the taxes and any other liens with which the property was burdened. The truth is that Clark, according to his own testimony, did not know at the time he assumed to make the contract that the property in controversy was burdened with any assessment, although he did know that other properties owned by the supposed principals were burdened with assessments.

If then the contract which Clark assumed to make meant $5,700 in Liberty Bonds over and above the commission, it can be said, if the testimony for the plaintiff is believed, that Hermann showed that he was able to perform his part of the contract, and that

he was damaged as claimed by him. It was not necessary to show that Johnson went to each of the supposed principals and tendered the bonds and demanded a deed. It was not necessary to show that the owners were in default in order to entitle the plaintiff to recover damages from the unauthorized agent. Hermann is not suing on the express contract made by the unauthorized agent nor is he suing the supposed principals; but he is suing the unauthorized agent on an implied warranty for damages caused by him.

9. The burden of proof is on the third person to show the agent's implied warranty, its breach, and the resulting damages: 1 Mechem on Agency (2 ed.), § 1399. Those damages may be great or small, full or partial, depending upon the time when the third person discovers the assumed agent's want of authority. In the instant case Clark's alleged lack of authority appears to have been discovered after Hermann had found Johnson as a purchaser. Hermann was therefore able, according to the testimony given for the plaintiff, to perform his part of the contract. If the supposed principals had neither authorized nor ratified Clark's act, it was not necessary for Hermann to go through the vain and futile ceremony of tendering the bonds to the supposed principals; and so far as Clark is concerned, he waived any necessity of a tender by absolutely refusing to sell to Johnson unless Johnson assumed the assessments.

McBRIDE, C. J., and RAND, J., concur.